# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### DANVILLE DIVISION

| | |
|---|---|
| TWILA WALLACE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 4:12-CV-00054 |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Plaintiff Twila Wallace ("Wallace") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that she was not disabled and therefore not eligible for supplemental security income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 1381–1383f. Specifically, Wallace alleges that the ALJ erred by discrediting her treating physicians' opinions when determining her Residual Functional Capacity ("RFC").

This court has jurisdiction pursuant to 42 U.S.C. § 1383(c)(3). This case is before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The parties have fully briefed and argued all issues, and the case is ripe for decision. I have carefully reviewed the administrative record, the legal memoranda, the arguments of counsel, and the applicable law. I conclude that the ALJ failed to properly consider and weigh the medical opinion evidence as required by the regulations. Accordingly, I **RECOMMEND DENYING** the Commissioner's Motion for Summary Judgment (Dkt. No. 16), **GRANTING** in part Wallace's Motion for Summary Judgment (Dkt. No. 14), and reversing and remanding this case under sentence four of 42 U.S.C.

§ 405(g), for further administrative consideration consistent with this Report and Recommendation.

## STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Wallace failed to demonstrate that she was disabled under the Act. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Wallace bears the burden of proving that she is disabled within the meaning of the Act. English v. Shalala, 10 F.3d 1080, 1082 (4th Cir. 1993) (citing 42 U.S.C. § 423(d)(5)). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects her ability to perform daily activities or certain forms of work. Rather, a claimant must show that her impairments prevent her from engaging in any and all forms of substantial gainful employment given the claimant's age, education, and work experience. See 42 U.S.C. § 423(d)(2).

The Commissioner uses a five-step process to evaluate a disability claim. <u>Walls v. Barnhart</u>, 296 F.3d 287, 290 (4th Cir. 2002). The Commissioner asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment;[1] (4) can return to her past relevant work; and if not, (5) whether she can perform other work. <u>Johnson v. Barnhart</u>, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the RFC, considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); <u>Taylor v. Weinberger</u>, 512 F.2d 664, 666 (4th Cir. 1975).

## STATEMENT OF FACTS

### Social and Vocational History

Wallace was born on May 14, 1975 (Administrative Record, hereinafter "R." at 118), and was a younger person on her alleged onset date. 20 C.F.R. § 416.963(c). Wallace graduated high school and obtained an associate's degree in business management. R. 791, 812. Wallace's most recent employment was collecting information for the Census Bureau more than a decade ago. R. 158. She had previously worked as an in-home health aide, child care provider, and factory worker. R. 158, 1056. During the relevant period, Wallace lived with and cared for her teenage son. R. 170, 1042, 1045. Wallace further reported that she had the capacity to prepare

---

[1] A "listed impairment" is one considered by the Social Security Administration "to be severe enough to prevent an individual from doing any gainful activity, regardless of her or her age, education, or work experience." 20 C.F.R. § 404.1525(a).

3

meals, do laundry, wash dishes, vacuum, sweep, attend church, drive short distances, and grocery shop with the use of a scooter. R. 170–174, 212–219, 1042.

**Claim History**

Wallace originally filed a protective application for both SSI and disability insurance benefits ("DIB") on November 29, 2006, claiming that her disability began on August 1, 2002. R. 118. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 50–52, 55–58. On June 17, 2009, Administrative Law Judge ("ALJ") Mark A. O'Hara held a hearing to consider Wallace's disability claims (R. 781–830) and on August 28, 2009, ALJ O'Hara entered a decision denying Wallace's SSI and DIB claims. R. 11–38. On September 10, 2010, the Appeals Council denied request for review on Wallace's DIB claim (R. 44–46),[2] but remanded Wallace's SSI claim to the ALJ for rehearing. R. 41–42. The Appeals Council directed the ALJ on remand to "[g]ive further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations." R. 41. On June 16, 2011, ALJ O'Hara held a second hearing on Wallace's SSI claim.[3] R. 1027–62. Wallace was represented by an attorney at the hearing, which included testimony from Wallace and vocational expert Robert Jackson. R. 1027.

On August 25, 2011, the ALJ denied Wallace's SSI claim finding that Wallace suffered from the severe impairments of "obesity, status post left foot fusion, and a back disorder." R. 842–43. The ALJ found that these impairments, either individually or in combination, did not

---

[2] This court subsequently affirmed the denial of Wallace's DIB claim. Wallace v. Comm'r of Soc. Sec., 4:10CV00057, 2011 WL 2899111 (W.D. Va. July 15, 2011) report and recommendation adopted, 4:10CV00057, 2011 WL 3319597 (W.D. Va. Aug. 1, 2011).
[3] Supplemental security income is not payable prior to the month following the month in which the application was filed; thus, the applicable onset date for Wallace's SSI claim is November 29, 2006. 20 C.F.R. § 416.335.

meet or medically equal a listed impairment. R. 842–43. The ALJ further found that Wallace retained the residual functional capacity ("RFC") to perform light work and specifically that Wallace could only "lift or carry 10 pounds occasionally and less than 10 pounds frequently, stand or walk 2 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday." R. 843. Further, the ALJ limited Wallace to work that involved no climbing ladders, ropes or scaffolds and "other postural activities only occasional[ly]," such as climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. R. 843. Finally, the RFC included a restriction to avoid concentrated exposure to vibration and to workplace hazards such as moving machine parts and unprotected heights. R. 843. The ALJ determined that Wallace could not return to her past relevant work as a shoe boot laborer, cutter, tacker, mill worker, forklift operator, childcare attendant, home health aide, and census worker (R. 869), but that Wallace could work at jobs that exist in significant numbers in the national economy, such as general production worker, material handler, telephone order clerk, inspector/grader, and receptionist. R. 870. Thus, the ALJ concluded that Wallace was not disabled. R. 971. On December 6, 2012, the Appeals Council denied Wallace's request for review of her SSI claim (R. 831–35), and this appeal followed.

## ANALYSIS

Wallace alleges that the ALJ improperly weighed the opinions of her treating physicians and failed to adequately consider the limitations imposed by her impairments. Specifically, Wallace argues that the ALJ erred by rejecting her physicians' opinions that she was incapable of sedentary work because she needed to elevate her left foot throughout the workday and had limited reaching capability. Having reviewed the record as a whole, I agree that the ALJ did not properly address the limitations set forth in the treating physicians' opinions, and instead relied

upon conclusory and unsubstantiated statements to reject the opinions and find Wallace capable of sedentary work.

Wallace has a history of scoliosis in her back, for which she received surgery as a child. R. 456, 803, 1037. Wallace continued to experience back pain and limitations as a result of scoliosis and degenerative changes, and received treatment for her back pain throughout the relevant period. R. 456, 535, 537–43, 547–49, 551, 555, 568–72, 578, 608–09, 627, 980, 1010–11, 1038. In 2008, Wallace's physicians recommended that she undergo a spinal fusion surgery. R. 551.

The focus of this appeal is on the limitations imposed by Wallace's left foot and ankle. In 2003, Wallace developed pain and swelling in her left foot without any history of trauma. Dr. Paul Sparks diagnosed Wallace with a fragmented stress fracture of the navicular bone of her left foot. The fracture was slow to heal, and eventually Wallace developed osteoarthritis secondary to avascular necrosis in her left foot. R. 308, 437, 440. Dr. Sparks placed Wallace in a boot in an effort to allow the foot to heal. Unfortunately, Wallace continued to have significant problems, and she remained quite symptomatic. Over the course of the next eight years, Wallace used some type of device—walking boot, short leg walking cast, cam walker, crutches, rolling walker—on her left foot in an attempt to heal the fracture and eliminate the resulting pain and discomfort. R. 380, 404, 416, 426, 437, 439–40. Despite a myriad of treatments, including physical therapy, water therapy, bone growth stimulators, pain medication, steroid injections, and even bone fusion surgery, the fracture to Wallace's navicular bone did not heal during the relevant time period at issue in this case. R. 948. The foot and ankle remained extremely painful and significantly limited Wallace.

In November 2004, Wallace underwent a medial column fusion in her left foot. R. 380. Wallace continued to have pain and swelling in her left foot, and in May 2006, she was diagnosed with a neuroma (typically a painful bundle of nerves) in the wound, (R. 457), and was referred by Dr. Sparks to a pain management specialist and physical therapy. R. 453, 458. Wallace began treating with podiatrists Danita Reese, D.P.M. and Laurence Rubin, D.P.M., in 2006 and 2007. R. 460–62, 514, 742. She continued to complain of pain and swelling in her left foot, and in 2008, Wallace was again referred to physical therapy for chronic traumatic pain to the left foot and ankle, and received injections in her left foot. R. 706, 738. On August 12, 2010, Wallace underwent a CT scan of her left ankle, which revealed an incompletely healed interval fracture of the base of the fifth metatarsal, and surgical fusion of the talus navicular and medial cuneiform with lack of osseous fusion between the navicular and medial cuneiform and partial medial osseous fusion of the talus avicular, and degenerative changes of the articulating talonavicular joint. R. 948. Wallace continued to wear a cam boot, and receive treatment from podiatrists Reese and Rubin up through the date of the ALJ's opinion. R. 697–700, 705–25, 738, 950–51, 960–66.

The record contains assorted medical opinions regarding Wallace's ability to function in light of her foot and back impairments, specifically with regard to Wallace's need to elevate her feet during the workday, and her ability to reach in all directions. The history of Wallace's left foot injury and resulting chronic pain condition and osteoarthritis is meticulously recounted by the ALJ in a thirty-two page denial decision. R. 839–71. The ALJ spends only two paragraphs of the opinion explaining the weight given to the opinions of Wallace's treating physicians that Wallace is incapable of sedentary work, setting forth the basis for rejecting those opinions and

concluding that Wallace is capable of sedentary work. R. 868–69. The pertinent medical opinions are set forth below.

Judith Anderson, F.N.P. – April 29, 2009[4]

Nurse Anderson treated Wallace from 2001 through 2009 under the direction of family practitioner Paul. S. Buckman, M.D. R. 474–89, 529, 532, 681–90. On April 29, 2009, Nurse Anderson completed a work limitations form, in which she found that Wallace was limited in lifting, carrying, standing and walking; that she can sit for ten hours total, could never climb, balance, stoop, crouch, kneel, crawl and push or pull; that she has limited reaching in all directions due to decreased range of motion in her right shoulder and right arm; that she should not work around heights, moving machinery, in temperature extremes or vibrations due to history of left ankle fracture and osteoporosis; and that she would need to elevate her feet twenty degrees. R. 589–93. As part of the medical findings supporting her assessment, Nurse Anderson wrote, "difficulty with chronic pain, nerve damage to [left] ankle since I've been following her 3/2001. She has had multiple sprains to her [right] ankle [secondary] to imbalance. She has to use a supportive brace on the [left] foot." R. 593.

Paul S. Buckman, M.D. – June 3, 2009

Wallace's treating family doctor, Paul S. Buckman, M.D., completed a work related limitations form on June 3, 2009. R. 602–606. Dr. Buckman, and nurse practitioners under his

---

[4] Nurse Anderson is considered a "non-acceptable medical source" under the regulations, and the ALJ is not required to give her opinion the same weight as a treating physician. 20 C.F.R. §§ 416.913(a), 416.927(c). However, the ALJ is required to at least consider the opinion of a non-acceptable medical source, especially when there is evidence in the record to suggest that the non-acceptable medical source had a lengthy relationship with the claimant and can present relevant evidence as to the claimant's impairment or ability to work. Foster v. Astrue, 826 F. Supp. 2d 884, 886 (E.D.N.C. 2011); Social Security Ruling ("SSR") 06-03p. The opinions of non-acceptable medical sources, which often have "close contact with…individuals and have personal knowledge and expertise to make judgment about their impairment(s), activities, and level of functioning over a period of time," are to be considered as "valuable sources of evidence for assessing impairment severity and functioning." SSR 06-03p. See also Ledbetter v. Astrue, 8:10–CV–00195–JDA, 2011 WL 1335840, at *10 (D.S.C. April 7, 2011) ("[O]pinions from medical sources, even when not 'acceptable medical sources,' are important and should be evaluated on key issues such as impairment severity and functional effects." (citing SSR 06–03p)).

direction, periodically saw Wallace beginning in August 2001 for her various medical problems. R. 474–489, 744–755.  Dr. Buckman noted that Wallace could only occasionally lift/carry up to ten pounds; stand for less than one hour during a workday; sit for less than four hours during a week day; never perform postural activities such as climbing, stooping, and pushing/pulling; had limited ability to reach in all directions; should avoid heights, machinery, and vibration; and would require her feet to be elevated twenty hours a day. R. 602–606. Dr. Buckman concluded that Wallace was totally disabled from any work activity. R. 605. In support of his opinion, Dr. Buckman made references to Wallace's use of walking boots, left ankle osteoarthritis, and right shoulder pain. R. 602–03.

Podiatrist Danita Reese, D.P.M. – August 7, 2009 & April 29, 2011[5]

Wallace saw Dr. Reese for left foot pain more than a dozen times between 2006 and 2011. R. 697–22, 725–27, 960–966.  Dr. Reese completed a musculoskeletal questionnaire form on August 7, 2009. R. 595–600.  Dr. Reese indicated that Wallace could sit for more than two hours at a time; stand for twenty minutes at a time; sit for six hours in an eight-hour workday; stand/walk for less than two hours in an eight-hour workday; would need a job that permitted shifting positions at will; would need to lie down three to six times a shift; would require her leg to be elevated ninety degrees to her body throughout the day; would require a cane or other assistive device; and can only occasionally lift and carry up to ten pounds. R. 595–99. Dr. Reese found that Wallace would not have significant limitations in reaching, handling, or fingering and had the ability to frequently bend and twist at the waist. R. 599.  Dr. Reese also stated that Wallace wore foot braces and cam walker boots. R. 600.

---

[5] Licensed podiatrists are acceptable medical sources "for purposes of establishing impairments of the foot, or foot and ankle only." 20 C.F.R. § 416.913(a)(4).

9

Dr. Reese completed another work related limitations form on April 29, 2011. R. 914–18. Dr. Reese noted that Wallace's ability to lift/carry was affected by her impairments, but Dr. Reese did not indicate a particular weight limitation. R. 915. Dr. Reese further indicated that that Wallace could stand/walk two or three hours in an eight-hour workday; that Wallace's ability to sit was not affected, although "elevation may be required;" that she could never perform postural activities such as climbing, crouching, and pushing/pulling; and that she had unlimited reaching, handling, fingering and feeling. R. 916. With regard to elevation of her feet, Dr. Reese noted that Wallace would require one hour of elevation two or three times per eight-hour period, although Dr. Reese did not note at what height. R. 917. Dr. Reese concluded that Wallace could perform sedentary or less than sedentary work. R. 917.

David Williams, M.D. – December 9, 2009

On December 9, 2009, state agency physician Dr. Williams reviewed Wallace's file, and assessed Wallace's RFC. Dr. Williams found that Wallace could occasionally lift and/or carry ten pounds; frequently carry less than ten pounds; stand and/or walk for a total of two hours; sit for a total of about six hours in an eight-hour workday; would have unlimited ability to push or pull other than lifting/carrying; could occasionally climb stairs, balance, stoop, kneel, crouch and crawl; could never climb ladders, ropes; had no manipulative limitations; and had no environmental limitations with the exception of avoiding concentrated exposure to vibration and hazards (such as machinery and heights). R. 253–54.

Podiatrist Laurence Rubin, D.P.M. – April 4, 2011

Dr. Rubin occasionally saw Wallace for her foot pain starting in January 2007. R. 514, 738, 740, 742, 950–51. Dr. Rubin completed a work related limitations form April 4, 2011. R. 909–13. Dr. Rubin found that Wallace could occasionally lift up to ten pounds; stand/walk for

10

a total of three hours in an eight-hour workday; occasionally balance, stoop, and push/pull; and never climb, crouch, kneel, and crawl. Dr. Rubin noted that Wallace cannot fully bear weight on her left foot, and must elevate her feet "1/2 a day." R. 912. Dr. Rubin concluded that Wallace could perform sedentary work. R. 912. Dr. Rubin stated in support of his assessment, "[Wallace] has a non-union of her left foot—this causes pain and does not allow her to weight bear totally on the left." R. 913.

At the June 16, 2011 administrative hearing, Wallace's counsel asked the vocational expert whether an individual whose feet must be elevated two hours per day would be able to work a sedentary job, to which the vocational expert replied, "no." R. 1060. The vocational expert further testified that elevation of the feet at ninety degrees would eliminate competitive employment. R. 1060. The vocational expert later clarified that typically an individual doing sedentary work can prop her foot up six or eight inches, but if an individual has to elevate her leg at "therapeutic level, which is hip level or above," she would not be able to engage in substantial gainful activity. R. 1061.

In his decision denying benefits, the ALJ rejected the opinions of Drs. Buckman and Reese regarding Wallace's left foot limitations because their opinions of disability were "reserved to the Commissioner," and the opinions were not supported by the longitudinal record. R. 868. The ALJ generally adopted the assessment of state agency physician Dr. Williams as consistent with the other credible evidence of record. R. 868. Furthermore, the ALJ "agree[d] with treating physician Dr. Rubin that the clamant is capable of sedentary work." R. 868. The ALJ found that the suggestion that Wallace would need to elevate her feet was not supported by the record, and construed Drs. Reese and Rubin's opinions that Wallace's feet must be elevated as consistent with propping her legs up six to eight inches. R. 869.

11

Under the regulations, an ALJ may give more weight to the opinion of a state agency physician than those of treating physicians. However, in such situations, the ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); Saul v. Astrue, Civ. Action No. 2:09-cv-1008, 2011 WL 1229781, at *2 (S.D. W.Va. March 28, 2011). Here, the ALJ determined that the treatment records do not support a need for Wallace to elevate her feet, but provided no explanation or basis for this conclusion. R. 869. The ALJ then "construes" Dr. Reese and Rubin's opinions as consistent with propping one's legs up six to eight inches. This interpretation by the ALJ is directly contradicted by Dr. Reese's August 7, 2009 opinion unmistakably requiring elevation at ninety degrees. R. 598. It also disregards Wallace's long history of left foot and ankle pain, and the salutary purpose behind elevating her feet. As the vocational expert noted, the therapeutic level of elevation is hip level or above. R. 1061.

The medical opinion evidence demonstrates that every treating or examining physician found that Wallace must elevate her feet during the workday. The opinions differ with regard to the degree and the amount of time of elevation. Dr. Buckman found that Wallace must elevate her feet for twenty hours a day at an unspecified level. Nurse Anderson stated an elevation level of twenty degrees for an unspecified period of time. Dr. Reese stated an elevation level of ninety degrees in one opinion, and elevation time of one hour, two to three times a day in her second opinion. Dr. Rubin found that Wallace must elevate her feet "1/2 a day." Only Dr. Williams, the state agency physician who reviewed Wallace records but did not examine or treat Wallace, found that she did not need to elevate her feet during the work day. R. 253–54. Notably, Dr. Williams' functional assessment is silent about whether Wallace needs to elevate her feet, and does not address the other opinions of record at that time which found that Wallace would need

12

to elevate her feet. The ALJ did not address the ambiguity in the medical opinion evidence as to whether Wallace must elevate her feet, how high, and for how long, aside from simply "rejecting" Drs. Buckman and Reese's opinions. Nor did the ALJ support his finding that Wallace need not elevate her feet higher than six to eight inches with reasons based in the record. Instead, the ALJ provided conclusory statements that are unsubstantiated by the record as the basis for his decision.

In support of his decision, the ALJ stated that Wallace's treatment record does not support her allegations regarding the severity of her limitations. Wallace reported at the administrative hearing that she wears a cam walker on the left foot which was prescribed by her doctors; that her foot condition has gotten worse over time; that all of her foot doctors advised her to keep her feet elevated; that she sits in her recliner "pretty much all day" and keeps her foot propped up; and that her foot stays swollen all day long and she has pain all day long. R. 1035–36. To discredit this testimony, the ALJ noted that Wallace was able to obtain her associate's degree, notwithstanding her impairments. R. 868. Wallace obtained her associate's degree in 2003, three years prior to the applicable onset date of this claim, and eight years before the ALJ denied benefits. R. 1043. The ALJ also found that Wallace's treatment has been "generally conservative with no back surgery since childhood." R. 868. Wallace endured significant medical treatment both before and during the relevant period relating to her foot, ankle and back problems. The treatments directed to Wallace's back and foot impairments during the relevant period included pain medication, physical therapy, epidural steroid injections and bone fusion surgery. No medical provider has suggested that Wallace undergo any more aggressive or invasive treatment, nor does the ALJ mention any particular treatment Wallace should pursue to address her severe medical impairments.

13

The ALJ also found Wallace's statements about her abilities inconsistent because she was helping her ailing mother and stated that she was trying to help her as much as possible. The ALJ also assailed Wallace's credibility because she told her doctor during a January 2009 examination that she was thinking of having another child. The ALJ wrote "the claimant is asserting she cannot even do sedentary work, but at the same time tells her family practice that she is thinking of having another child—childrearing is not really a sedentary activity." R. 868. Merely discussing with a partner or medical provider plans to have a child is not the equivalent of activity consistent with competitive work at a sedentary level. Likewise, there is no indication in the record that Wallace had a child or even attempted to do so. Thus, I find that the record does not support questioning the consistency of Wallace's statements about the care she gives to her mother or her family planning statements.

With regard to the opinions of Wallace's treating physicians, the ALJ noted that "the orthopedic specialists who treated Wallace's ankle have not suggested that she is disabled." R. 868. In the same paragraph, the ALJ rejected the opinions of the treating physicians who stated that Wallace was not capable of sedentary work because those are "opinion[s] on an issue of disability reserved to the Commissioner . . ." In fact, Wallace's orthopedic specialists did not render an opinion as to her disability. The ALJ also stated that Dr. Reese's treatment notes are "cryptic" and do not reflect a debilitating condition. R. 868. The ALJ does not refer to any specific treatment notes in support of this statement. A review of Dr. Reese's treatment notes depicts consistent notations of pain and swelling in Wallace's left foot. R. 697, 699–700, 705, 707, 711, 713, 717, 722, 725, 960–65. Dr. Reese prescribed a panoply of treatments for Wallace, including pain medications, physical therapy, and injections. Id. While Dr. Reese's handwritten treatment notes are somewhat sparse, the record as a whole (over one thousand pages) is not, and

14

repeatedly documents Wallace's complaints of pain and swelling in her left foot. R. 453, 457–58, 751–52.

The Commissioner attempts to bolster the ALJ's decision by citing to records in its brief showing "intact motor strength," "lower extremities symmetric with full muscle strength," "normal joint range of motion in hips and knees," and "full extremity range of motion." Comm'r Br. at 16. These records were not specified by the ALJ in support of his decision; and further, when reviewed in full, these records do not lend support to the ALJ's conclusion. See R. 652 ("All motor units are grossly 5/5 bilaterally but again, she has bilateral ankle orthotics on.")

I am cognizant of the fact that ALJ is given wide discretion, and is vested with the authority to weigh conflicting evidence. However, the ALJ's decision must be made in light of the entire record, and the record is replete with evidence that Wallace has a medical need to elevate her feet. As noted, all of Wallace's treating physicians determined that she must elevate her feet to some degree and for some period of time during the day. The vocational expert testified that elevation of Wallace's feet at a therapeutic level would prevent sedentary work. The ALJ did not reconcile the various limitations set forth by Wallace's treating physicians, together with the less restrictive opinion by the state agency physician and vocational expert's testimony.[6] The ALJ rejected the treating physicians' opinions without providing "good reasons" as required by the regulations, and concluded that Wallace need not elevate her leg to the extent that it would interfere with her ability to perform sedentary work. The ALJ must provide a more detailed explanation, supported by substantial evidence in the record, as to why those disabling limitations—specifically the consistent finding that Wallace must elevate her legs

---

[6] There is also ambiguity in the medical opinion evidence as to whether Wallace has limited reaching capability, which would impact her ability to perform sedentary work. Dr. Buckman and Nurse Anderson both concluded that Wallace's reaching was limited, while Dr. Williams did not. R. 253–54, 590, 603. The ALJ does not address this inconsistency in the opinion evidence, nor does he specify the weight given to this portion of Dr. Buckman and Nurse Anderson's opinions. R. 868–69.

15

throughout the workday—are not entitled to weight.[7] See 20 C.F.R. § 416.927(d)(2)(The Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

The Appeals Council remanded this case to the ALJ to "give further consideration" to Wallace's RFC and to give "specific references to the record in support of assessed limitations." Substantial evidence does not support the RFC determined by the ALJ where the denial decision fails to address appropriately the one of the primary functional limitations identified by Wallace's treating physicians. On remand, the ALJ should consider having Wallace examined and her records reviewed by a consultative examiner who can assess the scope of limitations imposed by Wallace's severe medical impairments.

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **DENYING** the Commissioner's motion for summary judgment, **GRANTING in part** plaintiff's motion for summary judgment, and **REMANDING** this case under sentence four of 42 U.S.C. § 405(g) to the Commissioner for further proceedings to reassess Wallace's residual functional capacity and the weight to be accorded to her treating sources. See Ledbetter v. Astrue, 8:10-CV-00195-JDA, 2011 WL 1335840, at *3 (D.S.C. Apr. 7, 2011)("Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four may be appropriate to allow the Commissioner to explain the basis for the decision.")(citing Smith v. Heckler, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); Gordon v.

---

[7] Wallace also alleges that the ALJ failed to properly consider the impact of her obesity and the drowsiness she experiences as a result of medication on her functional limitations. Pl's Br. at 38. Upon remand, the ALJ should fully and completely consider the relevant medical evidence of record with regard to the limitations imposed by Wallace's severe impairments.

16

Schweiker, 725 F.2d 231, 235 (4th Cir.1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence)).

The Clerk is directed to transmit the record in this case to Jackson L. Kiser, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

        Enter: February 18, 2014

        *Robert S. Ballou*

        Robert S. Ballou
        United States Magistrate Judge